## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

       Plaintiff,

vs.                                                                                    No. CR 20-1627 JB

TAMARA WALLACE,

       Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Tamara Wallace's Objection to the Pre-Sentence Report, filed October 7, 2025 (Doc. 214)("Objection"). The Court has the sentencing scheduled for October 14, 2025. <u>See</u> Minute Order at 1, filed August 26, 2025 (Doc. 212). The primary issue is whether the Court should sustain Defendant Tamara Wallace's Objection to the United States Probation Office's application of a 2-level enhancement under United States Sentencing Guideline ("U.S.S.G." or "Guidelines") § 2D1.1(b)(12), based on the USPO's determination that Wallace was convicted of a drug trafficking crime, and, in the process, "'maintained a premises for the purposes of distributing a controlled substance.'" Presentence Investigation Report ¶ 30, at 9, filed June 18, 2025 (Doc. 204)("PSR")(quoting U.S.S.G. § 2D1.1 (b)(12)). The Court overrules Wallace's Objection to the USPO's application of a 2-level enhancement, pursuant to U.S.S.G. § 2D1.1(b)(12), because the Court determines that, in accordance with U.S.S.G. § 2D1.1's Application Note 17, Wallace "maintained" the premises - - her apartment in Santa Fe, New Mexico -- for the "primary purpose" of distributing controlled substances, even though Wallace also uses her apartment for simultaneous living or employment purposes. U.S.S.G § 2D1.1, Application Note 17. <u>See</u> U.S.S.G. § 2D1.1. The Court concludes that one of Wallace's primary purposes in maintaining her apartment is for distributing controlled substances, because (i) the residence is the scene of two drug-related shootings in 2019 and 2020,

see PSR ¶ 14, at 6; (ii) when law enforcement arrest Wallace and search the apartment, it finds almost 200 grams of methamphetamine (actual), about 120 grams of heroin, roughly four grams of tramadol/acetaminophen,[1] almost seven grams of suspected crack cocaine, thirty strips of Suboxone, and just under a gram of powdered cocaine, see PSR ¶ 23, at 8; (iii) when law enforcement arrest Wallace and search the apartment, it finds tools of the trade in the form of scales and firearms for the purposes of protecting "herself, the narcotics, and the proceeds of her narcotic sales," Addendum to the Presentence Report ¶ 5, at 1-2, filed October 7, 2025 (Doc. 215)("PSR Addendum")(referring to the Plea Agreement, filed on May 8, 2025 (Doc. 191)("Plea Agreement")); (iv) the premises contains multiple locked safes with controlled substances, see PSR ¶ 23, at 8; and (v) law enforcement finds $1,731.00 in United States currency, see PSR ¶ 17, at 7.   See also United States v. Lozano, 921 F.3d, 944, 946-47 (10th Cir. 2019)("Lozano"); United States v. Murphy, 901 F.3d 1185, 1191-92 (10th Cir. 2018)("Murphy"); United States v. Cantrell, 817 F. App'x 614, 619 (10th Cir. 2020)("Cantrell")(unpublished);[2]

---

[1] Tramadol is a schedule IV controlled substance, and it is an opioid analgesic that is approved to treat moderate to moderately severe pain.   See U.S. Drug Enforcement Admin., Drug Fact Sheet: Tramadol, https://deadiversion.usdoj.gov/drug_chem_info/tramadol.pdf (last visited Oct. 13, 2025).   Tramadol can be combined with acetaminophen, brand name Ultracet, for the treatment of acute pain, not to exceed five days of therapy.   See U.S. Food and Drug Admin., Ultracet (tramadol hydrochloride and acetaminophen) tablets, for oral use, C-CIV (2019).

[2] United States v. Cantrell is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.   See Tenth Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.   However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court concludes that United States v. Cantrell; United States v. Martinez, 803 F. App'x 204 (10th Cir. 2020); United States v. Hendrickson, 592 F. App'x 699 (10th Cir. 2014); United States v. Leroy, 298 F. App'x 711 (10th

United States v. Martinez, 803 F. App'x 204, 207 (10th Cir. 2020)("Martinez")(unpublished). The Court, therefore, concludes that the USPO's application of the 2-level enhancement, pursuant to U.S.S.G. § 2D1.1(b)(12), is not contrary to the U.S.S.G. See U.S.S.G. § 2D1.1; U.S.S.G § 2D1.1, Application Note 17. Accordingly, the Court overrules Wallace's Objection.

## FINDINGS OF FACT

The Court takes its facts from: (i) the PSR, see PSR ¶¶ 1-109, at 1-25; (ii) the Objection, see Objection ¶¶ 1-2, 1-2; (iii) the PSR Addendum, see PSR Addendum ¶¶ 1-9, at 1-2; and (iv) the Plea Agreement, see Plea Agreement ¶¶ 1-20, at 1-14. The Court makes its findings of fact by a preponderance of the evidence. See United States v. Williams, No. CR. 17-2556 JB, 2020 WL 4016108, at *6 (D.N.M. July 16, 2020)(Browning, J.)(citing United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)). Accord United States v. Zapata, 546 F.3d 1179, 1192 (10th Cir. 2008). The Court may rely on hearsay if the hearsay is reliable. See United States v. Banda, 168 F. App'x 284, 289 (10th Cir. 2006)(unpublished)("[T]here is no prohibition on considering hearsay testimony at sentencing, provided it bears indicia of reliability."). The evidence and information upon which the Court relies must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

1.      In July, 2018, Wallace starts as the personal caretaker of Jackson Fullbright, receiving room and board as compensation. See PSR ¶ 83, at 21.

---

Cir. 2008); and United States v. Banda, 168 F. App'x 284 (10th Cir. 2006) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

2.      Wallace does not have other employment.  See PSR ¶ 83, at 21.

3.      At that time and until roughly 2020, Wallace is in a relationship with Gordon Riddle.  See PSR ¶ 68, at 19.

4.      On November 19, 2020, law enforcement arrest Antonio Quintana-Pena and Wallace at Wallace's address in Santa Fe, New Mexico.  See PSR ¶ 16, at 6.

5.      When law enforcement arrest Wallace and search the apartment, it finds almost 200 grams of methamphetamine (actual), about 120 grams of heroin, roughly four grams of tramadol/acetaminophen, almost seven grams of suspected crack cocaine, thirty strips of Suboxone, just under a gram of powdered cocaine, two scales covered with suspected drug residue, a Para Ordnance Inc. 16.40 LDA .40 caliber handgun (Serial #P117149), a stolen Glock 37 .45 caliber handgun (Serial FYC609), an Anderson Manufacturing AM-15 .223 caliber rifle loaded with two high-capacity magazines, a Colt Automatic .25 caliber semi-automatic handgun with an obliterated serial number, and $1,731.00 in cash.  See PSR ¶ 23, at 8.

5.      The firearms are for her protection, the protection of the narcotics, and the protection of the proceeds from my sales.  See Plea Agreement ¶ 10(c), at 6.

6.      Wallace "inten[ded] to distribute" the methamphetamine.  Plea Agreement ¶ 10(a), at 5.

7.      In addition to the above items, the residence contains "multiple locked safes," where drugs are stored.  See PSR ¶ 23, at 8.

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005)("Booker"), the Supreme Court of the United States of America severs the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory. See Booker, 543 U.S. at 245.  In excising the two sections, the Supreme Court leaves the remainder

of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." Booker, 543 U.S. at 261.

Congress directs sentencing courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four statutorily defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of § 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a).  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines;  (ii) the offense nature and the defendant's character;  (iii) the available sentences;  (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes;  (v) the need to provide restitution to victims;  and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines sentencing ranges are no longer mandatory, both the Supreme

Court and the United States Court of Appeals for the Tenth Circuit clarify that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007)("Gall").  The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'"  United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349).  A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See Booker, 543 U.S. at 261-62.

The Tenth Circuit joins "a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d at 1264.  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the presumption of reasonableness "is an appellate court presumption" (emphasis in original); United States v. Conlan, 500 F.3d 1167, 1169-70 (10th Cir. 2007)(stating that "the government rightly concedes the district court erred in affording a presumption of reasonableness to the recommended advisory sentence," because "the guideless are presumptively reasonable only at the appellate level").  Instead, the trial

court must undertake the § 3553(a) balancing of factors without any presumption in the advisory

Guidelines sentence's favor.[3]  See Kimbrough v. United States, 552 U.S. at 90-91; Gall, 552 U.S.

_____

[3]Attorneys and courts often say that the "Guidelines" are advisory, Gall, 552 U.S. at 46 ("As a result of our decision [in Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."), but it appears more appropriate to say that the resulting Guidelines ranges or sentences are advisory.  The Court must consider the Guidelines, see Gall, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, departing from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.  The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently depart from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16 (2008).  A district court that attempts to depart from U.S.S.G. § 1B1.1's basic

at 46-47; Rita v. United States, 551 U.S. at 351.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court recognizes, however, that sentencing judges are "'in a superior position to find facts and judge their import under § 3553(a)' in each particular case." Kimbrough v. United States, 552 U.S. at 89 (quoting Gall, 552 U.S. at 51).

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000)("Apprendi"), the Supreme Court reaffirms the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment *within the range* prescribed by statute." 530 U.S. at 481 (emphasis in original). The Supreme Court cautions, however, that the Constitution of the United States of America limits this discretion and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be

---

sequence most likely acts procedurally unreasonably. See Gall, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.).

submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborates on its holding in Apprendi, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(citing Ring v. Arizona, 536 U.S. 584, 602 (2002); Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2013)("Alleyne")). In Booker, however, the Supreme Court holds that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing Booker, 543 U.S. at 259). See Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement." (second alteration added by Booker)(quoting Booker, 543 U.S. at 221)). More recently, the Supreme Court holds that the requirements in Apprendi apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne, 570 U.S. at 103.

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005)("Magallanez"), the Tenth Circuit holds that Blakely v. Washington and United States v. Booker do not change the district court's enhancement findings analysis. See Magallanez, 408 F.3d at 684-85. United States v. Magallanez involves plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine. See 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributes to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on government witnesses' testimony of the various amounts that they

had sold to the defendant -- attributes 1,200 grams of methamphetamine to the defendant and uses that amount to calculate her sentence under the Guidelines. See 408 F.3d at 682. The district court's findings increase the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's fifty grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount. See 408 F.3d at 682-83. On appeal, the Tenth Circuit states that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." Magallanez, 408 F.3d at 684. Although Booker makes the Guidelines ranges "effectively advisory," 543 U.S. at 245, the Tenth Circuit reaffirms that "district courts are still required to consider Guideline ranges, [543 U.S. at 246], which are determined through application of the preponderance standard, just as they were before," Magallanez, 408 F.3d at 685.

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[4] "[T]he application of an enhancement . . . does not implicate

---

[4]Although the Tenth Circuit states in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet concluded that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is necessary to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement does not require the district court to determine that the defendant committed murder, but only that she obstructs a homicide investigation). See United States v.

the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi only where the fact at issue increases his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished)(holding that, after Alleyne, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence"). The Court notes:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v. United States . . . expands the rule from Apprendi v. New Jersey, . . . (holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence. See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.). The

---

Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level by 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence, because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges, entitle the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (concluding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increase the defendant's sentence from twenty years to consecutive forty-year terms).

Supreme Court has clarifies that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.' [] And under our Constitution, when 'a finding of fact alters the legally prescribed punishment so as to aggravate it[,] that finding must be made by a jury of the defendant's peers beyond a reasonable doubt." United States v. Haymond, 588 U.S. 634, 645 (2019)(quoting Alleyne, 570 U.S. at 112-14). Further, the Tenth Circuit determines that a district court can use its own finding on drug quantity to enhance a defendant's Guidelines range consistent with Alleyne, "so long as the court does not use its own drug quantity finding to alter the defendant's *statutory* sentencing range." United States v. Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

<u>**ANALYSIS**</u>

Wallace argues that the USPO errs in applying a 2-level enhancement in the PSR ¶ 19, at 5, pursuant to USSG § 2D1.1(b)(12), based on the USPO's determination that Wallace "'maintained a premises for the purpose of manufacturing or distributing a controlled substance.'" Objection ¶ 1, at 1 (quoting PSR ¶ 19, at 5 (quoting USSG § 2D1.1(b)(12)). Wallace contends that the 2-level enhancement does not apply, because, although law enforcement finds drugs and "tools of the trade" in the Santa Fe apartment in which she lives, the distribution of controlled substances is not her primary or principle use of the apartment; rather, drug distribution is an "'incidental or collateral use.'" Objection ¶ 2, at 2 (quoting U.S.S.G § 2D1.1, Application Note 17). The Court disagrees with Wallace's argument, however, because the Court determines that, in accordance with U.S.S.G. § 2D1.1's application note 17, Wallace "maintained" the "premises" -- her Santa Fe apartment -- for a primary purpose of distributing controlled substances, even though Wallace also used her apartment for simultaneous living or employment purposes. USSG § 2D1.1(b)(12). See U.S.S.G § 2D1.1, Application Note 17. The Court reaches the conclusion that Wallace maintained her apartment for a primary purpose of distributing methamphetamine,

because of the facts that (i) the residence is the scene of two drug-related shootings in 2019 and 2020, see PSR ¶ 14, at 6; (ii) when law enforcement arrest Wallace and search the apartment, it finds almost 200 grams of methamphetamine (actual), about 120 grams of heroin, roughly four grams of tramadol/acetaminophen, almost seven grams of suspected crack cocaine, thirty strips of Suboxone, and just under a gram of powdered cocaine, see PSR ¶ 23, at 8; (iii) when law enforcement arrest Wallace and search the apartment, it finds tools of the trade in the form of scales and firearms -- for the purposes of protecting "herself, the narcotics, and the proceeds of her narcotic sales," PSR Addendum ¶ 5, at 1-2 (referring to the Plea Agreement ¶ 10(c), at 6 ("I possessed these firearms to protect myself, my narcotics, and the proceeds of my narcotic sales.")); (iv) the premises contains multiple locked safes with controlled substances, see PSR ¶ 23, at 8; and (v) law enforcement finds $1,731.00 in United States currency, see PSR ¶ 17, at 7. See Murphy, 901 F.3d at 1191-92; Cantrell, 817 F. App'x at 619; Martinez, 803 F. App'x at 207. The Court, therefore, concludes that the USPO's application of the 2-level enhancement, pursuant to U.S.S.G. § 2D1.1(b)(12), is not contrary to the U.S.S.G.

The Court overrules Wallace's Objection to the USPO's application of a 2 level-enhancement, pursuant to U.S.S.G. § 2D1.1 (b)(12), because, (i) under U.S.S.G. § 2D1.1's Application Note 17, Wallace holds a "possessory interest" in her Santa Fe apartment, given that Wallace admits that she lives there, see Objection ¶ 2, at 2; PSR ¶ 83, at 21; and (ii) under U.S.S.G § 2D1.1, Application Note 17 and Tenth Circuit case law, one of the primary purposes of Wallace's maintenance of the apartment is the distribution of controlled substances, see U.S.S.G. § 2D1.1(b)(12); U.S.S.G § 2D1.1, Application Note 17. See Murphy, 901 F.3d at 1191-92; Cantrell, 817 F. App'x at 619; Martinez, 803 F. App'x at 207.

When calculating Wallace's guideline range, the USPO first determines that U.S.S.G. § 2D1.1 is the relevant guideline governing a defendant's violation of 18 U.S.C. § 841(a)(1), and

- 13 -

that, under U.S.S.G. § 2D1.1, the base offense level for Wallace's offense is 32. See PSR ¶ 29, at 9. See also U.S.S.G. § 2D1.1(a)(5). The USPO then adds a 2 level-enhancement based on "specific offense characteristics" related to Wallace's offense: "Possession with Intent to Distribute Methamphetamine and Aiding and Abetting." PSR ¶ 30, at 9. As the USPO explains, the 2 level-enhancement, pursuant to § 2D1.1(b)(12), is justified, because, in relation to her offense, Wallace "'maintained a premises'" -- her Santa Fe apartment -- "'for the purpose of manufacturing or distributing a controlled substance'" -- methamphetamine. PSR Addendum ¶ 1, at 2 (quoting U.S.S.G. § 2D1.1(b)(12)). Wallace argues that the UPSO's 2-level enhancement, pursuant to § 2D1.1 (b)(12), is not applicable in the case. See Objection ¶¶ 1-2, at 1-2. Wallace concedes that: (i) she lives at the Santa Fe apartment; (ii) she pleads guilty to a violation of 21 U.S.C. § 841(a)(1), Possession with Intent to Distribute Methamphetamine and Aiding and Abetting, and (iii) "drugs were found in one bedroom of the home" by law enforcement. Objection ¶ 2, at 2. Nonetheless, Wallace contends that the apartment's primary use is not manufacturing or distributing controlled substances; rather, the "primary purpose of the home was as the residence of Mr. Fullbright," given that she "was [his] caretaker" at the Santa Fe residence. Objection ¶ 2, at 2.

U.S.S.G. § 2D1.1 is the relevant guideline that courts reference when evaluating offenses related to "unlawful manufacturing, importing, exporting, or trafficking (including possession with intent to commit these offenses); attempt or conspiracy." U.S.S.G. § 2D1.1. U.S.S.G. § 2D1.1(b)(12), in turn, directs courts to apply a 2-level upward enhancement to a defendant's base offense level "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. 2D1.1(b)(12). U.S.S.G. 2D1.1(b)(12)'s application note17 explains:

Section (b)(12) applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution.

Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.

Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. 2D1.1(b)(12) Application Note 17.

Under U.S.S.G. § 2D1.1(b)(12) Application Note 17, the Court, therefore, must make two determinations to assess the appropriateness of the USPO's application of U.S.S.G. § 2D1.1(b)(12)'s 2-level enhancement to Wallace's base level offense score. See U.S.S.G. § 2D1.1(b)(12) Application Note 17. First, the Court must determine whether Wallace has a "possessory interest" in the Santa Fe apartment. U.S.S.G. § 2D1.1(b)(12) Application Note 17. Second, if the Court determines that Wallace has a "possessory interest" in the apartment, it must determine "the extent to which" Wallace "controlled access to, or activities at, the premises." U.S.S.G. § 2D1.1(b)(12) Application Note 17. Because Wallace concedes that she has a "possessory interest" in the Santa Fe apartment, U.S.S.G. § 2D1.1(b)(12) Application Note 17, given that she admits she lives at the apartment, and, given that she "was a caretaker at the residence" who was paid in room and board, Objection ¶ 2, at 2, the Court need evaluate only the second question related to the extent to which Wallace uses the apartment for her controlled substance distribution activities, see U.S.S.G. § 2D1.1(b)(12) Application Note 17. See U.S.S.G. § 2D1.1(b)(12).

As U.S.S.G. § 2D1.1(b)(12) Application Note 17 outlines, U.S.S.G. § 2D1.1(b)(12)'s 2-level enhancement is applicable even if drug distribution is "not . . . the sole purpose for which the premises was maintained." U.S.S.G. § 2D1.1(b)(12) Application Note 17. Instead, the Guidelines require that drug distribution be only "one of the defendant's primary or principal uses for the premises, rather than one of the defendant's 'incidental or collateral' uses for the premises." U.S.S.G. § 2D1.1(b)(12) Application Note 17 (no citation for quotation). Here, in assessing whether drug distribution is "one of the defendant's primary or principal uses for the premises," the Court, in accordance with U.S.S.G. § 2D1.1(b)(12) Application Note 17, must balance "how frequently" Wallace uses the Santa Fe apartment "for manufacturing or distributing" controlled substances, and "how frequently" Wallace uses the premises "for lawful purposes," such as sleeping, eating, living, and storing her belongings. U.S.S.G. § 2D1.1(b)(12) Application Note 17.

To assist the Court's evaluation of "the extent to which" Wallace uses her apartment for the distribution of drugs, the Court references Tenth Circuit holdings, which offer two caveats to the application of U.S.S.G. § 2D1.1(b)(12) to defendants' sentences. U.S.S.G. § 2D1.1(b)(12) Application Note 17. See Lozano, 921 F.3d at 946-47; Murphy, 901 F.3d at 1191-92; Cantrell, 817 F. App'x at 619; Martinez, 803 F. App'x at 207. First, in Murphy, 901 F.3d at 1191-92, the Tenth Circuit clarifies that district courts must evaluate the frequency with which a defendant uses his or her premises for lawful versus unlawful purposes with a consideration that

> [t]he frequent/substantial metric is a reciprocal sliding scale. A substantial drug distribution that regularly and quickly passes through the home (two or three days) on a bi-monthly or tri-monthly basis may qualify as a primary use of the premises for drug-related purposes much the same as an exquisitely frequent, but relatively paltry, operation.

901 F.3d at 1191. The Tenth Circuit continues, explaining that courts should conduct U.S.S.G. § 2D1.1(b)(12) Application Note 17's primary or principal purpose test in assessing a defendant's

use of his or her premises, with some recognition of a totality of the circumstances related to the defendant's crime:

> A totality of the circumstances assessment includes: (1) the frequency and number of drugs sales occurring at the home; (2) the quantities of drugs bought, sold, manufactured, or stored in the home; (3) whether drug proceeds, employees, customers, and tools of the drug trade (firearms, digital scales, laboratory equipment, and packaging materials) are present in the home, and (4) the significance of the premises to the drug venture.

Murphy, 901 F.3d at 1191-92 (citing United States v. Henderson, 604 F. App'x 655, 658 (10th Cir. 2015)(unpublished)("[A]lthough the premises was used as a residence, the drug trafficking activities were frequent and substantial enough to warrant the enhancement."). See United States v. Verners, 53 F.3d 291, 296-97 (10th Cir. 1995); United States v. Contreras, 874 F.3d 280, 284-85 (7th Cir. 2017)("Instead of merely weighing the amount of legal activity against the illegal activity, the sentencing court should focus on both the frequency and significance of the illicit activities . . . ."); United States v. George, 872 F.3d 1197, 1206 (11th Cir. 2017); United States v. Bell, 766 F.3d at 634, 637 (6th Cir. 2014)("We assess the primary or principal use of the home . . . by comparing the frequency of lawful to unlawful use. At bottom, the question is whether Bell's home played a significant part in distributing drugs."); United States v. Johnson, 737 F.3d 444, 447-48 (6th Cir. 2013).

Furthermore, when outlining the factors it considers when evaluating the totality of the circumstances related to a defendant's use of his or her premises, the Tenth Circuit explains that "frequency calculations" related to the defendant's use of the apartment for drug distribution should be a mere consideration, as opposed to being a necessary mathematical calculation where the court must show its work. Murphy, 901 F.3d at 1191. For example, in Cantrell, 817 F. App'x at 619, the Tenth Circuit, explained that, because the presence of "tools of the trade in a residence provides significant support for the application of § 2D1.1(b)(12) 2-level enhancement," the Tenth

Circuit places great emphasis on the third factor being present when considering applying the 2-level enhancement. Cantrell, 817 F. App'x at 619. In addition, when evaluating the applicability of § 2D1.1(b)(12)'s 2-level enhancement, the Tenth Circuit explains that "[t]he enhancement clearly contemplates a premises with more than one primary use," which is particularly relevant when the premises is used as the defendant's home. Murphy, 901 F.3d at 1190. Accordingly, as the Tenth Circuit explains, a premises can serve multiple, simultaneous "lawful" and "unlawful" purposes, in that a premises can be used for lawful activity one-hundred percent of the time by a defendant, while it can simultaneously be used for a defendant's unlawful drug activity one-hundred percent of the time. Murphy, 901 F.3d at 1191 ("In other words, both simultaneous uses may well be primary.")

> Most people do not occupy their home 100% of the time; they spend much time at work, on vacation, running errands, pursuing social activities, etc. While a home may not be occupied 100% of the time, it is considered to be a home 100% of the time in that it is always available to the owner (or renter), it contains most of the owner's possessions, and it is a safe haven. That same reasoning is apt in multiple use situations. Actual drug dealing may not be a constant in a home, but the home may well serve as a safe place to store drugs, cash derived from drug sales (thereby shielding it from official notice), and tools of the trade (such as equipment related to selling drugs and firearms), as well as serve as a headquarters for drug-related operations. With that in mind, one may use his home (in the broad sense of the word) for lawful purposes 100% of the time and also use it (in the same broad sense of the word) for unlawful drug activity 100% of the time. In other words, both simultaneous uses may well be primary.

Murphy, 901 F.3d at 1191 (emphasis in original).

The Tenth Circuit consistently cites this principle when evaluating whether district courts have applied appropriately § 2D1.1(b)(12) 2-level enhancements to the defendants' base offense levels. See Lozano, 921 F.3d at 946-47; Murphy, 901 F.3d at 1191-92; Cantrell, 817 F. App'x at 619; Martinez, 803 F. App'x at 207. For example, Martinez, 803 F. App'x at 207, features a defendant's ineffective-assistance-of-counsel claim based on the defendant's argument that his counsel offered ineffective assistance when failing to object to the district court's application of

the § 2D1.1(b)(12) 2-level enhancements to the defendant's sentence, because the defendant's recreational vehicle ("RV") -- the premises where law enforcement found drugs and from where it was determined that the defendant had distributed the drugs -- served as the defendant's home. See Martinez, 803 F. App'x at 207. That the defendant used the RV as his home, meant, according to the defendant, that the RV's primary purpose was not drug-related. See 803 F. App'x at 207. The Tenth Circuit, however, disagrees with the defendant's argument, reasoning instead that the RV has a primary use of facilitating the defendant's drug distribution, because, even though the defendant uses the RV as his home, evidence shows that the defendant stores a significant quantity of methamphetamine, digital scales, and firearms in the RV -- all of which are paraphernalia of the methamphetamine drug trade. See 803 F. App'x at 207. The Tenth Circuit, therefore, dismisses the defendant's ineffective-assistance-of-counsel claim, noting that any potential objection his counsel could have made to the district court's application of the § 2D1.1(b)(12) 2-level enhancement "would have failed for a lack of merit" based on the particular facts of the defendant's case. Martinez, 803 F. App'x at 207.

Comparably United States v. Cantrell, 817 F. App'x at 619, features a defendant disputing the district court's application of U.S.S.G. § 2D1.1(b)(12)'s 2-level enhancement, because, as the defendant argues, there is "nothing in discovery that points to the frequency of licit or illicit uses of the residence." Cantrell, 817 F. App'x at 619. In dismissing the defendant's arguments, the Tenth Circuit concludes that there is "no non-frivolous basis for challenging the district court's application of § 2D1.1(b)(12)." Cantrell, 817 F. App'x at 619. Specifically, the Tenth Circuit concludes that it is clear that the primary purpose of the defendant's maintenance of his residence is drug-related, given that law enforcement seizes from within the residence drug paraphernalia, including "methamphetamine, hydrocodone, marijuana, two digital scales, and used and unused packaging baggies." 817 F. App'x at 619. The Tenth Circuit further justifies its ruling by

explaining that, in instances where a defendant stores a large quantity of drugs and drug paraphernalia in his or her premises, the distribution of drugs is most likely the premises  primary purpose.  See Cantrell, 817 F. App'x at 619.

> The cases are legion in our circuit (as well as others) that have deemed such items as law enforcement found in the search to be "'tools of the trade' that is, means for the distribution of illegal drugs."  United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir. 1991); accord United States v. Hall, 473 F.3d 1295, 1304 (10th Cir. 2007); United States v. Mendoza-Salgado, 964 F.2d 993, 1008 (10th Cir. 1992).  And we have concluded that the presence of such tools of the trade in a residence provides significant support for the application of the § 2D1.1(b)(12) enhancement.  See United States v. Murphy, 901 F.3d 1185, 1191-92 (10th Cir. 2018)(noting that, in the "totality of the circumstances assessment" appropriate for determining whether to apply the § 2D1.1(b)(12) enhancement, courts should consider, inter alia, whether "tools of the drug trade (firearms, digital scales, laboratory equipment, and packaging materials) are present in the home"); United States v. Martinez, 803 F. App'x at 207 (holding that "any objection" to application of the § 2D1.1(b)(12) enhancement "would have failed for a lack of merit" because the defendant "used her RV to store a significant quantity of methamphetamine, digital scales, and firearms").

Cantrell, 817 F. App'x at 619-20.

Based on the text of U.S.S.G. § 2D1.1(b)(12) Application Note 17, and the guidance of Tenth Circuit precedent, the Court concludes that a primary purpose in Wallace maintaining the Santa Fe apartment is to distribute controlled substances.  See U.S.S.G. § 2D1.1(b)(12); U.S.S.G. § 2D1.1(b)(12) Application Note 17.  See also Lozano, 921 F.3d at 946-47; Murphy, 901 F.3d at 1191-92; Cantrell, 817 F. App'x at 619; Martinez, 803 F. App'x at 207.  Four findings support the Court's conclusion that a primary purpose in Wallace maintaining the apartment is to distribute controlled substances.

First, similar to the defendant's argument in Cantrell, 817 F. App'x at 619, and the defendant's argument in Martinez, 803 F. App'x at 207, where law enforcement located a significant quantity of drugs and tools of the trade necessary for the distribution of drugs, law enforcement found that Wallace's apartment contained scales contaminated with what appeared to

be drug residue, a large quantity and variety of a controlled substances -- almost 200 grams of methamphetamine (actual), about 120 grams of heroin, roughly four grams of tramadol/acetaminophen, almost seven grams of suspected crack cocaine, thirty strips of Suboxone, and just under a gram of powdered cocaine -- and a significant amount of firearms, which includes "a Para Ordnance Inc. 16.40 LDA .40 caliber handgun (Serial #P117149), a stolen Glock 37 .45 caliber handgun (Serial FYC609), an Anderson Manufacturing AM-15 .223 caliber rifle loaded with two high-capacity magazines, a Colt Automatic .25 caliber semi-automatic handgun with an obliterated serial number." PSR ¶ 23, at 8. As the Tenth Circuit notes in Cantrell, 817 F. App'x at 619, the presence of a large quantity of a controlled substance within a premises, in addition to "such tools of the trade" associated with the distribution of controlled substances, "provides significant support for the application of the § 2D1.1(B)(12) enhancement." 817 F. App'x at 619.

Second, the Court finds the multiple locked safes, containing controlled substances, indicative of the residence's drug-related use. See PSR ¶ 23, at 8. Alone, one bedroom containing multiple locked safes does not provide circumstantial evidence that the residence is being used for a drug-related purpose. When considering, however, that the safes, drugs, scales, and firearms "'are found together in the house of [an admitted] drug dealer, they take on a different hue, providing strong circumstantial evidence that [s]he used the home' for drug-related activity." Murphey, 901 F.3d at 1195 (first alteration in Murphey, 901 F.3d at 1195)(quoting United States v. Bell, 766 F.3d 634, 637 (6th Cir. 2014)).

Third, similar to the Tenth Circuit's rationale in Murphy, 901 F.3d at 1193, and in Cantrell, 817 F. App'x at 620, the Court considers the cash that the law enforcement found as evidence of drug activity, see PSR ¶ 17, at 7. Fullbright compensates Wallace for her services with room and board. See PSR ¶ 83, at 21. Before her current employment, Wallace is "a homemaker from 2004

to 2018," PSR ¶ 83, at 21, and the record is silent as to other potential sources of income. Without "other identifiable and legitimate source[s] of income," the Court can "infer that [Wallace's] 'main, if not sole, source of funds' was drug trafficking, and this in turn would fortify the plausible inferences from the other evidence that [Wallace] used [her] home for drug trafficking." Cantrell, 817 F. App's at 620 (quoting Murphy, 901 F.3d at 1193).

Last, the final strand binding together the totality of these circumstances is Quintana-Pena's phone -- a ledger of his illicit activities -- containing messages "regarding the sale and purchase of narcotics," and photographs of the firearms later seized. PSR ¶ 14, at 6. His frequent "contact [with] a known drug trafficker" only tightens the weave. PSR ¶ 14, at 6. Wallace accurately notes that, the PSR does not specify how often the residence is used for distribution or document transactions at the doorstep. See Objection ¶ 2, at 2. The pattern, however, is unmistakable: this house is not merely a home. As suggested above, the evidence converges on one logical conclusion -- that the residence serves as a base of operations; its walls not only shelter but are an instrument, and its privacy the veil beneath which controlled substances are distributed. Even assuming Wallace is not participating actively in Quintana-Pena's trafficking activity, were it not for Wallace's residence, Quintana-Pena would need to maintain another premises to warehouse the arsenal and controlled substances that maintains his trade.

Wallace's argument that, because the "residence belonged to Ms. Wallace's employer" and "the primary purpose of the home was as the residence of Mr. Fullbright," U.S.S.G. § 2D1.1(b)(12)'s 2-level enhancement is not appropriate, does not convince the Court to sustain the Objection, Objection ¶ 2, at 2. The circumstances' totality counsel the home's primary purpose was not merely serving as the Fullbright residence or Wallace's place of employment. For similar reasons, the Court concludes that Wallace's related contention -- that this case is one of "merely incidental or collateral" drug distribution -- is not persuasive. Objection ¶ 2, at 2 (referencing

U.S.S.G. § 2D1.1(b)(12) Application Note 17.).  The home is part of the drug-supply chain, and is a safe harbor for the product as it moved through the stream of illegal commerce.  As the Tenth Circuit consistently has repeated, a home may simultaneously hold more than one primary purpose. See, e.g., Murphy, 901 F.3d at 1191 ("[O]ne may use her home (in the broad sense of the word) for lawful purposes 100% of the time and also use it (in the same broad sense of the word) for unlawful drug activity 100% of the time. In other words, both simultaneous uses may well be primary.")(emphasis in original); United States v. Mier-Garces, 967 F.3d 1003, 1034 (10th Cir. 2020).   The Court overrules Wallace's Objection to the USPO's 2-level enhancement under U.S.S.G. § 2D1.1(b)(12).

**IT IS ORDERED** that: (i) Defendant Tamara Wallace's Objection to the Pre-Sentence Report, filed October 7, 2025 (Doc. 214), is overruled; (ii) the applicable offense level for Count I is 31, and the applicable criminal history category is III; (iii) the United States Sentencing Guidelines' imprisonment range is 135 to 168 months; (iv) Count II carries an additional mandatory 60 months that must run consecutively to the sentence for Count I; and (v) the total United States Sentencing Guidelines imprisonment range is 195 to 228 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ryan Ellison
   United States Attorney
Stephen R. Kotz
Blake Nichols
David B. Hirsch
Robert I. Goldaris
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

*Attorney for the Defendant*